**SALT POND ASSOCIATES, Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants.**

Civ. A. No. 92–597–LON.

United States District Court,
D. Delaware.

Feb. 19, 1993.

768

F. Michael Parkowski (argued), Jeremy W. Homer, and Jonathan Eisenberg, of Parkow-ski, Noble & Guerke, Dover, DE, for plaintiff.

Mary M. McDonough, U.S. Attorney's Office, Wilmington, DE, Robert E. Lefevre (argued), U.S. Dept. of Justice, Washington, DC, Barry Gale, U.S. Army Corps of Engineers, Philadelphia, PA, of counsel, for defendants.

## OPINION

LONGOBARDI, Chief Judge.

## I. BACKGROUND

This dispute stems from Plaintiff's efforts to develop a piece of land for resale as waterfront lots. On November 29, 1988, the Plaintiff paid 5.5 million dollars for property located along the Town of Bethany Beach known as the Salt Pond property. Docket Item ("D.I.") 3 at 4. In an effort to ensure that any and all federal, environmental wetlands requirements were being satisfied under the Clean Water Act (hereinafter "CWA") and other environmental protection laws,[1] the Plaintiff ("Salt Pond") apparently engaged in extensive consultation with the United States Army Corp of Engineers ("the Government"),[2] as well as their own environmental experts.[3] Id. at 6–8. However, despite efforts by both sides to protect the "developing" interests of Salt Pond and the "environmental" interests that the Government is legally required to protect, irreconcilable disputes have arisen between the parties. These disputes, leading to Plaintiff's request

---

[1]. "The Clean Water Act establishes a comprehensive program to restore and maintain the chemical, physical and biological integrity of the waters of the United States." *Route 26 Land Development Ass'n v. U.S. Government,* 753 F.Supp. 532, 536 (D.Del.1990), *aff'd,* 961 F.2d 1568 (3rd Cir.1992). *See* 33 U.S.C. § 1251. Under the terms of the Act "the discharge of any pollutant by any person" except in compliance with various provisions of the CWA is prohibited. 33 U.S.C. § 1311(a). The "discharge of a pollutant" is defined as any addition of any pollutant to navigable waters from any point source. 33 U.S.C. § 1362(12). The term "pollutant" is defined broadly to include "dredged soil", "biological materials", "heat", "rock" and "sand." 33 U.S.C. § 1362(6). Navigable waters is defined broadly to mean the waters of the United States including the territorial seas. 33 U.S.C. § 1362(7).

[2]. The Secretary of the Army is authorized pursuant to section 404 of the CWA to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Furthermore, rules and regulations governing the reach of the Corp's authority under section 404 of the CWA are codified in the regulations found at 33 C.F.R. Parts 320–329. Central to the Plaintiff's request to this Court is the Government's alleged misuse of two of these regulations as justification for its actions. *See infra* at notes 10 and 13.

[3]. Before undertaking the land development project and since then, the Plaintiff has relied heavily on the input of environmental consultant/expert Charles C. Miller, a principal in the firm of Environmental Consulting Services Inc.

to this Court for relief, center around the breadth of the Government's regulatory jurisdiction under the circumstances presented by this case as well as the allegedly adverse impact this land development will have on the environment.

On January 25, 1989, the Plaintiff submitted to the Government a wetlands delineation report requesting verification by the Government of its proposed section 404 wetlands delineation. *Id.* at 5.[4] On April 4, 1991, after Plaintiff had spent over two years towards the development of the property, the Government informed the Plaintiff that a twelve acre area of the total land was in fact under the jurisdictional control of the Government. *Id.* On August 12, 1991, during an on-site inspection by the Government's investigators, the Government determined that ten ponds (hereinafter "the ponds") had been excavated in wetlands by the Plaintiff and that the Plaintiff had engaged in regulated land clearing in wetlands. D.I. 10 at 9.

On October 5, 1991, the Government issued a Cease and Desist letter which required the Plaintiff to discontinue any and all development of the land because of numerous environmental violations discovered during the latest on-site investigation by the Government. *Id.*[5] As a follow-up to that order, the Government directed the Plaintiff to apply for an "after-the-fact" permit[6] for work already undertaken and work still to be undertaken in connection with the development of the Salt Pond property. *Id.* at 10.[7]

After significant correspondence regarding the appropriate procedural mechanisms, Salt Pond submitted to this after-the-fact permit process under full reservation of its rights in the hope that any and all environmental violations could be remedied so that the development of the land could proceed to completion. D.I. 3 at 11. Plaintiff further implored the Government to sever from the permit application consideration of Plaintiff's application for a water and sewer utility crossing permit (hereinafter "the Loop Canal permit") pleading that the issuance of this permit under Section 10 of the Rivers and Harbors Act (hereinafter "RHA")[8] was completely unrelated to matters pertaining to section 404 wetlands jurisdiction and the excavation of the ponds. *Id.* at 12.[9] The Government

---

**4.** *See* 33 C.F.R. § 328.3(b) (a wetlands delineation report indicates a proposed wetlands jurisdictional boundary premised on the technical considerations encompassed by the definition of wetlands). "Wetlands" which are encompassed under the Government's jurisdictional authority as a navigable water of the United States (*see* 40 C.F.R. § 230.3(t)) are "areas that are inundated or saturated by surface ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 33 C.F.R. § 328.3(b).

**5.** The basis for the Government's Cease and Desist order is a major source of contention between the parties and is treated in more significant detail, *infra,* at Section IV(B)(1).

**6.** When a person or corporation violates the Clean Water Act before applying for a permit, the Government is authorized to issue the permit based on an "after-the-fact" permit application if initial corrective measures are completed. 33 C.F.R. § 326.3(e).

**7.** The Government identified the unauthorized work already undertaken by Salt Pond as the culverting and backfilling of a ditch, construction

of a swale and adjacent grading, mechanized land clearing and grading of wetlands associated with and adjacent to the ponds, york raking of wetlands and construction of five roads. D.I. 11, Attachment D at 1–2. The Government identifies the environmentally adverse work still to be undertaken as the proposed installation by Salt Pond of four utility pipelines in three locations beneath the Bethany Loop Canal to provide water and sewer service to the development. *Id.*

**8.** Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, provides in pertinent part:

... it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

*Id.* Activities subject to the requirements of Section 10 may also be subject to other statutory requirements. 33 C.F.R. § 321.1

**9.** Prior to the complete after-the-fact permit application, the Plaintiff had made a permit application to the Government for issuance of the Loop Canal permit on May 16, 1991. D.I. 4 at

responded by informing the Plaintiff that its request for the Loop Canal permit would only be processed in conjunction with the required "after-the-fact" permit. *Id.* at 13–14.[10]

After giving public notice of Salt Pond's permit application on March 25, 1992, and receiving extensive commentary on the project from environmental agencies and individual environmentalists,[11] the Government ultimately denied Salt Pond's application on September 24, 1992, finding the project in its entirety "contrary to the general public interest." D.I. 11, Attachment D at 19.[12] The Government offered the Plaintiff an opportunity to receive an alternative permit which would include the Loop Canal permit if Salt Pond satisfied 31 "special conditions." *Id.* at 19–24.[13] The Government indicated that if this alternative permit was not accepted by the Plaintiff, then Plaintiff would have 60

days in which to initiate action for environmental restoration including the complete restoration of the excavated ponds. *Id.,* Attachment B at 1–2. Additionally, subsequent efforts by Salt Pond to have the Loop Canal permit determination severed from the denial of the after-the-fact permit decision were once again rejected by the Government. D.I. 3 at 14 (citing the record).[14]

It is the Government's "conditional" grant of the Loop Canal permit which is at the heart of the present dispute. Particularly significant are those special conditions associated with the Plaintiff's filling in or otherwise restoring the ponds and the fact that the Loop Canal permit decision was linked to and dependent upon the pond restoration conditions. Specifically, the Plaintiff posits that the Government's environmental findings fail to establish a "sufficient causal connection between the alleged violations and

47. The Government responded by a letter dated June 25, 1991, indicating that the Government did not respond to piecemeal permit applications in "federally regulated wetlands associated with a single and complete project." *Id.* at 48. Rather, the Government required that the Loop Canal request be made part of a single application for all work requiring a permit that was being undertaken at the site. *Id.*

10. The Government's decision not to treat the Plaintiff's request for the section 10 Loop Canal permit separate from the section 404 permit was based on regulation 33 C.F.R. § 325.1(d)(2). D.I. 10 at 34. That section provides in pertinent part:

All activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required should be included in the same permit application. District engineers should reject, as incomplete, any permit application which fails to comply with this requirement. For example, a permit application for a marina will include dredging required for access as well as any fill associated with construction of the marina.

11. Pursuant to section 320.4(a) "the Corps must undertake a public interest review of all permit applications. In deciding whether to issue a permit, the Corps must carefully balance the benefits which reasonably may be expected to accrue from issuance of permits against its reasonably foreseeable detriments." *Route 26,* 753 F.Supp. at 536 n. 10 (citing 33 C.F.R. § 320.-4(a)(1)).

12. Factors included in the Government's evaluation of permit applications include conservation, economics, aesthetics, general environmental concerns, wetlands, flood hazards, floodplain values, land use, shore erosion and accretion, recreation, water supply and conservation, water quality, considerations of property ownership and, in general, the needs and welfare of the people. *See generally* 33 C.F.R. § 320. *See also* D.I. 11, Attachment D, for the Government's statements of its findings and environmental assessment.

13. In its supporting brief, the Government cites to 33 C.F.R. § 325.4(a)(3) as its authority that as a prerequisite to the granting of the Loop Canal permit, it may impose whatever special conditions it deems necessary to meet the public interest whether or not the specific activities that are the subjects of the special conditions themselves require a permit. D.I. 10 at 29. That regulation provides in pertinent part:

District Engineers will add special conditions to the Department of the Army permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement. Permit requirements will directly relate to the impacts of the proposal, appropriate to the scope and degree of those impacts and reasonably enforceable.

14. In rejecting the request for severance, the Government indicated to the Plaintiff that "linkage of the permit conditions was justified to prevent 'pollutant run-off into the ponds' from the housing units that might otherwise be constructed during the time period that the pond

the mandated corrective action." D.I. 3 at 12.[15]

Plaintiff contends that the Government has no section 404 jurisdiction over the excavation of these ponds because excavation is an unregulated activity for which no Government permit is required and, that by conditioning the grant of the after-the-fact permit, including the Loop Canal permit request, upon these pond restoration conditions, the Government is attempting to improperly regulate the excavation of these ponds through some sort of "back-door" approach to the permit application process. D.I. 3 at 16–25. It is the Plaintiff's ultimate position that any and all conditions relating to the restoration or filling of the excavated ponds are improper and that the withholding of the Loop Canal permit pending the restoration of the ponds is an improper use of the Government's authority.

## II. NATURE AND STAGE OF THE PROCEEDING

The Plaintiff has filed a motion for a preliminary injunction setting forth various demands for relief (hereinafter "Plaintiff's Motion"). D.I. 2. Specifically, the Plaintiff seeks (1) a suspension of the order that they be required to fill in the ponds and/or the affirmative deletion by this Court of any pond restoration conditions in any permit application, (2) a declaration from this Court directing the Government to issue Salt Pond the necessary Loop Canal permit and (3) an injunction preventing the Government from taking any enforcement action for the alleged environmental violations. *Id.*

Defendant opposes the motion and counters in a motion to dismiss (hereinafter "Defendant's Motion"), D.I. 9, that the Court is without proper jurisdiction to grant any of this relief sought by the Plaintiff. Specifically, the Government asserts that Salt Pond's demands that (1) this Court delete all the special conditions requiring restoration of the ponds to wetlands and (2) order the Government to issue the Loop Canal permit are beyond the scope of relief this Court may grant to the Plaintiff. D.I. 10 at 20–23. Additionally, the Government contends that Plaintiff's request for an injunction prohibiting the Government from taking any enforcement action is barred as impermissible "pre-enforcement" judicial review.[16] Lastly, the Government argues that even if the Court finds that it has jurisdiction to entertain Plaintiff's demands for relief, the Plaintiff has not satisfied its burdens under the appropriate standards upon which a preliminary injunction may be granted. D.I. 10 at 23–40.

---

restoration is being challenged." D.I. 3 at 14, citing to D.I. 4 at 187.

15. In its environmental findings denying the Plaintiff's after-the-fact permit application, the Government indicated that many of the activities described in that application, including the installation of the utility pipelines across the Loop Canal, "either individually or cumulatively, will not have a major adverse impact on the environment *provided* a mitigation plan is created ..." and compliance is achieved with *all* of the special conditions including those relating to the full restoration of the ponds already excavated by the Plaintiff (emphasis added). D.I. 11, Appendix D at 18.

16. This Court cannot rightfully undermine the Government's discretion as to whether or not to bring an enforcement action. *See generally Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Harmon Cove Condominium Ass'n v. Marsh*, 815 F.2d 949 (3rd Cir.1987); D.I. 10 at 18–19 (citing cases). A careful review of the Plaintiff's stance on this argument reveals that the Plaintiff offers no response to the notion that injunctive relief prohibiting an enforcement

action would improperly thwart the Government's enforcement powers.

Moreover, to grant this request for an injunction preventing an enforcement action, the Court would unquestionably be engaging in review of an enforcement matter prior to an enforcement action being brought. Such pre-enforcement review is impermissible. *See, e.g., Southern Pines Assocs. v. United States*, 912 F.2d 713, 715 (4th Cir.1990); *Hoffman Group Inc. v. EPA*, 902 F.2d 567, 569 (7th Cir.1990); *Route 26*, 753 F.Supp. 532; *McGown v. United States*, 747 F.Supp. 539, 541–42 (E.D.Mo.1990).

As is discussed more fully in the text accompanying notes 18–21 *infra*, however, this conclusion in no way prevents this Court from considering the more significant issues concerning Salt Pond's restoration or the Loop Canal permit because those issues directly relate to the *final* agency decision concerning the after-the-fact permit application. Unlike the Plaintiff's express request for an injunction preventing the Government from bringing an enforcement action *in the future* for Plaintiff's alleged environmental violations, judicial review of issues relating to the completed permitting process does not constitute

The Government brought its motion on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). However, since this Opinion is based on matters outside of the pleadings (*e.g.*, affidavits), it is more appropriately determined as a motion by the Government for summary judgment pursuant to the Federal Rule of Civil Procedure 56. *See* Fed.R.Civ.P. 12(c).[17] As a result, the Court will treat the Government's motion as one for summary judgment.

## III. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is "genuine" only if a reasonable jury could return a verdict for the nonmoving party. *Id.* Following a determination that no genuine dispute of material facts exists, the moving party must demonstrate that it is entitled to judgment as a matter of law.

Once the moving party has made and supported its motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn

from the material it submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v. Oberly,* 632 F.Supp. 1225, 1231 (D.Del.1986) (citing *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *aff'd,* 822 F.2d 388 (3rd Cir.1987). If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 258 (3rd Cir.1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV. DISCUSSION

Before proceeding with an analysis of the merits of the Government's permit decision (and whether the Plaintiff can meet the legal standards for the granting of injunctive relief), the Court finds it necessary in the first instance to confront those "jurisdictional" issues raised by the Government's summary judgment motion. Specifically, the Court must address whether at this point in the underlying dispute judicial review of the merits of the case at bar, constitutes inappropriate pre-enforcement review of an agency action and, more significantly, whether the Court is authorized to issue the scope of relief sought by the Plaintiff.

### A. *Judicial Review of Agency Action*

 Under the terms of the Administrative Procedure Act (hereinafter "APA"), district courts are only authorized to review *final* agency decisions. 5 U.S.C. § 704.[18] Whether an agency action is "final" is determined by a practical approach which focuses on the possible disruption to the administrative process and whether the agency action will result in legal consequences or a determination of rights or obligations. *Route 26,*

judicially proscribed, pre-enforcement review of agency enforcement matters.

17. The Court has put the parties on notice of this procedure and afforded them an opportunity to supplement the record. *See* Letter from the Court dated February 5, 1993. *Accord, Route 26,* 753 F.Supp. at 533 n. 1.

18. That statute provides: "Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural or intermediate agency action or ruling not directly reviewable is subject to review on the review of the *final* agency action ... (emphasis added)."

753 F.Supp. at 537, citing *Bell v. New Jersey and Pennsylvania*, 461 U.S. 773, 779–80, 103 S.Ct. 2187, 2191–92, 76 L.Ed.2d 312 (1983), and *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239–40, 101 S.Ct. 488, 493–94, 66 L.Ed.2d 416 (1980). Factors to be considered when determining the "finality" of an agency action under this approach include whether the agency action represents the definitive position of the agency, has the status of law and has the immediate impact on the daily operations of the owner. *Route 26*, 753 F.Supp. at 537–38, citing *Solar Turbines Inc. v. Seif*, 879 F.2d 1073, 1080 (3rd Cir.1989).

■ Here, judicial review of the pond restoration and the Loop Canal permit issues will not disrupt the administrative process in any cognizable manner. Pursuant to the terms and regulations of the Clean Water Act, the Government has already reached a thoroughly considered decision on the after-the-fact permit. D.I. 11, Attachment B. This decision has in fact resulted in legal consequences to Salt Pond and has effectively determined its obligations (*i.e.*, that it cease and desist in all land development and submit to the Government plans to mitigate the environmental damage including the complete restoration of the excavated ponds). *Id.*

Additionally, the Government's denial of the after-the-fact permit request by Salt Pond certainly reflects the agency's definitive position that the project is "contrary to the general public interest," *Id.*, Attachment D at 19, and apparently has the immediate impact on the daily operations of the owner which might be described as opening a Pandora's box. D.I. 3 at 13–15; D.I. 14 at 30–32. In short, the impact alleged is that this entire land development is stalled and those who have already invested in lots are prevented from building on their lots essentially rendering their purchases meaningless.[19] *Id.*

Lastly, and most significantly, Plaintiff's petition for judicial review of those issues relating directly to the merits of the Government's action comes *after* the permitting process has been completed.[20] *Cf. Route 26*, 753 F.Supp. at 540 (in declining to review Corps' exercise of jurisdiction the Court noted that the flexible scheme for resolving violations described by the CWA and its rules would be frustrated "[i]f landowners are allowed to challenge the Corps' assertion of jurisdiction prior to an enforcement action *or prior to the completion of the permitting process* ") (emphasis added). As a result, this Court finds that judicial review of issues relating to the completed permitting process does not constitute judicially proscribed pre-enforcement review of agency enforcement matters.[21] Consequently, the threshold question for this Court then becomes whether at this stage of the proceedings it has the jurisdiction to grant the *scope of relief* sought by the Plaintiff. Even if the Government's actions dur-

19. According to the affidavit of Managing Partner of Salt Pond Associates, Rupert Smith, unless Salt Pond can tell lot owners, home owners, prospective buyers and builders, and the bank that the ponds do not need to be filled and that permanent water and sewer service is available, "there is a strong probability that the development project will fail and the Partnership will lose millions of dollars." D.I. 4, at 200. Additionally, continued problems could subject the Plaintiff to withdrawal of bank support and multiple lawsuits. *Id.*

20. The Government itself concedes that Salt Pond's demands for injunctions directing the deletion of any pond restoration requirements and the granting of the Loop Canal permit would necessarily require judicial review of the merits of the permit decision on Salt Pond's permit application and that Salt Pond is entitled to judicial review of the merits under the procedures and standards of the APA. D.I. 10 at 20–21 ("Since neither the CWA or RHA provides for judicial review of Corps' actions taken thereunder, the APA controls the extent to which Corps actions under the CWA and RHA are reviewable by this Court"). *See also* D.I. 17 at 9.

21. In essence, it is the Court's conclusion that these issues are fit for judicial review and that significant hardship would occur if judicial review was withheld. *Accord, Consolidated Rail Corp. v. U.S.*, 812 F.2d 1444, 1451 (3rd Cir.1987). The Court concurs with Plaintiff's argument that if the Court were to not review the pond restoration and Loop Canal issues directly relating to the final permit decision until the Government brought an enforcement action, the Plaintiff might forever be precluded from any sort of judicial review on the merits if the Corps never brought such an action. D.I. 14 at 28.

The Court declines to follow the legal analysis proposed by the Government which is based on the *McGown* decision. GB, D.I. 10 at 17.

ing the permit application process were found to be improper, the Court must still determine whether it is empowered to grant the specific demands for preliminary relief sought by the Plaintiff, *i.e.*, the pond restoration and Loop Canal permit issues.

### 1. "Postponement" or "Deletion" of the Pond Restoration Conditions

■ "In seeking preliminary relief Plaintiff has requested that the Court suspend the deadlines contained in the permit related to pond restoration requirements so as to preclude the [Government] from prevailing in threatened enforcement action against Plaintiff."[22] D.I. 14 at 21. *See also*, D.I. 2, Proposed Order at ¶ 2(a) (Government shall modify the permit to "[d]elay the performance required of Plaintiff by the terms of any *Special Conditions* contained in the permit which require Plaintiff to perform work within a fixed period of time until such time as this litigation is finally determined") (emphasis in the original). The Plaintiff points to 5 U.S.C. § 705 of the APA as the source of this Court's authority to issue such relief. That section provides in pertinent part:

> ... On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal ..., may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

*Id.* Pursuant to the terms of this statutory provision, Plaintiff contends that in order to prevent irreparable injury this Court should issue an injunction to postpone the effective date of the agency action.

The Government aptly indicates, however, that Plaintiff's request to this Court on the pond restoration issue seems to go beyond a stay of the Government's requirement that the ponds be restored. D.I. 17 at 10 (Plaintiff's "spin" on its request for relief is flatly contradicted by the actual language of its pleadings). Rather, it is clear that the Plaintiff is also asking the Court to *delete* from the Government's permit any conditions requiring the restoration to wetlands of ponds excavated from those wetlands.[23]

The Government posits that under no provision of the APA, including section 705, is the Court granted the authority to dictate to the administrative agency the course of action to be taken or the terms of that action. It charges that Plaintiff's reference to "suspending" the deadlines established by the Government for restoring the ponds is a veiled attempt to re-characterize the relief Plaintiff actually seeks so as to bring it within the Court's authority under section 705. D.I. 17 at 9, 12. Put simply, the Government contends that a deletion of the pond restoration conditions is beyond the scope of relief available to the Plaintiff under the APA.

The Court rejects the Government's position that Plaintiff has "recharacterized" its demands for relief. Rather, it concludes that based on the entire record, including the proposed order submitted with the Plaintiff's motion, D.I. 2, Plaintiff seeks both a "postponement" of the Government's directive that the Plaintiff's submit a plan for the complete restoration of the ponds within 60 days and/or the total deletion of any and all conditions relating to the restoration of the ponds.

The Court holds that the plain language of section 705 gives it the appropriate jurisdiction to postpone the date of the Government's action concerning the restoration of

22. The Plaintiff requests this form of relief "so as to preclude the [Government] from prevailing in threatened enforcement action against Plaintiff." D.I. 14 at 21. The Court recognizes that a favorable decision for Plaintiff may have an *effect* on whether the Government elects to bring any sort of enforcement action against the Plaintiff. However, the Government would *not* be prevented from bringing an enforcement action if it decides in its prosecutorial discretion that such an action is an appropriate measure to take. As previously noted, this Court will not enjoin the

Government from bringing an enforcement action. *See supra*, note 16.

23. *See* D.I. 1 at 24, ¶ 2; D.I. 2 at 1 (Plaintiff requests that the Court direct the deletion from the permit decision all conditions which require Plaintiff to fill in ponds at the Salt Pond development site); *Id.*, Proposed Order at 2, ¶ 2(c) (Court should order that any requirements which relate to the filling of the ponds be deleted).

the ponds if the appropriate legal standards have been met by the Plaintiff.[24] Absent any legislative intent to the contrary, statutory language must ordinarily be regarded as conclusive. *Amp Inc. v. U.S.*, 820 F.2d 612, 615 (3rd Cir.1987) (citations omitted). Because the Court finds no contrary legislative intent, the statutory language is binding.[25]

### 2. Loop Canal Permit

The more significant jurisdictional issue to be resolved by this Court is whether it is authorized to grant the demands for relief as they relate to the Loop Canal permit. As previously indicated, Plaintiff wanted this permit request to be treated separately from the section 404 wetlands, pond restoration issues because it was completely unrelated to those issues. The Government has consistently rejected this proposition.[26] Plaintiff is now seeking that relief from this Court.

Specifically, "Plaintiff has requested a ruling from this Court establishing that the § 10 Loop Canal Utility crossing permit cannot be conditioned on pond restoration requirements, with ancillary direction to the USCOE to release such approved permit subject only to the established permit conditions directly relating to the utility pipeline work." D.I. 14 at 22. As the Court understands Salt Pond's request, it seeks two different things: that the Court declare that the Loop Canal permit determination should not have been based on pond restoration requirements but rather should have been treated separately from any section 404 issues *and*, more importantly, that the Court direct the authorization of the utility crossings permit subject to the handful of special conditions directly relating to the Loop Canal crossing. *See also* D.I. 17 at 10 n. 6 (establishing that the end result of Plaintiff's demands for relief is that this Court order the Governmental agency to issue the Plaintiff the utility crossings).

Plaintiff once again relies on section 705 as the source of the Court's authority to issue this extraordinary relief. D.I. 14 at 23. Plaintiff contends that "[i]n fashioning remedies under 5 U.S.C. § 705 the Court's powers are extensive and allow for the imposition of '... such conditions as may be required and to the extent necessary to prevent irreparable injury....'" *Id.* The Government asserts that the Plaintiff's position "is based on a highly improbable and unsupported interpretation of the express terms of [the statute],...." D.I. 17 at 12. It is their position that this statute establishes by its plain and unambiguous language that the Court is *without* authority to grant this kind of affirmative injunctive relief sought by the Plaintiff (*i.e.*, directing that the Government issue a permit imposing certain conditions). *Id.* at 12–14.

Upon a close scrutiny of the plain language of the statute, the Court rejects the Plaintiff's "extensive remedial powers" theory as untenable. In making the argument that the Court may impose "... such conditions as may be required and to the extent necessary to prevent irreparable injury....", the Plaintiff has selectively omitted critical portions of the statute which severely undermine its position. As stated previously, the critical language of that provision is:

> ... On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal ..., may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

■ When viewed in its entirety, the plain language of this statute reveals that the re-

---

**24.** The Government does not really dispute the fact that the statutory language grants this Court the jurisdiction to issue an order postponing the effective date of an agency action. Rather, it contends that the statute does not authorize the Court to affirmatively delete the pond restoration requirements and, more significantly, that the statute certainly does not grant this Court the authority to affirmatively direct the Government to issue the Loop Canal permit. D.I. 17 at 9–14.

**25.** In fact, the legislative history is completely void of any discussion on the scope of relief authorized by section 705.

**26.** *See* notes 9, 10 and 14, *supra*, discussing the "severance" of the Loop Canal permit issue.

medial powers granted to a reviewing court under this section are in fact extremely limited. The first section of the statute broadly describes *when* a court is authorized to act under the section (*i.e.,* "*On such conditions as may be required and to the extent necessary to prevent irreparable injury*") (emphasis added). The second part of the statute narrowly describes the scope of relief the reviewing court is authorized to grant to the petitioning party ("the reviewing court . . . may issue all necessary and appropriate process *to postpone the effective date of an agency action OR preserve the status or rights pending conclusion of the review proceedings* ") (emphasis added). Thus, the scope of relief available to the Plaintiff is limited to (1) a postponement of the agency action or (2) a preservation of the status or rights of the parties. When the Court is determining interim relief, by its very terms, the statute does not confer jurisdiction onto the Court to alter the status quo nor does it allow the Court in issuing interim relief to actually dictate specific terms or conditions to a governmental agency.

■ Despite its often creative efforts to suggest otherwise, the Plaintiff itself seems to realize that it is asking the Court to engage in both of these impermissible practices; that is, Plaintiff requests that this Court both disrupt the status quo and dictate specific agency action. D.I. 14 at 24 ("Plaintiff is simply requesting the Court to compel the USCOE to do something *which it should have done earlier,* namely issue the § 10 Loop Canal utility crossing permits with the permit conditions relating only to the utility crossing work.").

If this Court were to order that the Government issue the Loop Canal permit without the pond restoration conditions, the Court would *not* be preserving the status quo or rights of the parties since the Loop Canal permit has never been approved.[27] Such action is beyond the scope of relief available to the Plaintiff under this section. *Cf, F.P.C. v. Idaho Power Co.,* 344 U.S. 17, 20–21, 73 S.Ct. 85, 86–87, 97 L.Ed. 15 (1952) (appeals court decision to issue a license as modified, without the inappropriate conditions, *after a final review* of the record had occurred, reversed on ground that the Court usurped an administrative function). Furthermore, under the Plaintiff's proposed scenario, the Court would in fact be improperly substituting its judgment for that of the agency by dictating specific action to that agency. *See Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

Lastly, to accept the Plaintiff's broad theory of remedial powers under section 705 whereby the Court could essentially issue any and all requests for relief prior to a review of the administrative record (including the Court affirmatively dictating the terms of the specific action to be taken by the Government), the Court would necessarily be required to expunge the "postponing the agency action" and "preserving the status or rights" language out of the statute. *Commonwealth of Pa., Dep't of Public Welfare v. U.S. Dep't of Health & Human Servs.,* 928 F.2d 1378, 1385 (3rd Cir.1991) ("courts should avoid a construction of a statute that renders any provision superfluous"), citing *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955).[28] Accordingly, the Court holds that

27. Throughout its pleadings and dealings with this Court, the Plaintiff has at times artfully tried to characterize the Loop Canal permit as having been reviewed and approved by the Government. D.I. 14 at 1, 23. The Court notes that contrary to any suggestion by the Plaintiff, the record before the Court unequivocally reflects the fact that the Loop Canal permit has *not* been approved by the Government. Rather, in rejecting the Plaintiff's request for the after-the-fact permit, the Government offered the Plaintiff an alternative permit for some of the identified activities (including those relating to the Loop Canal) conditioned on both the satisfaction of numerous special conditions *and* the creation of a comprehensive mitigation plan designed to remedy the environmental damage allegedly caused by Plaintiff during its allegedly illegal activities. *See supra,* note 15; D.I. 17 at 11–12.

28. The Court's research reveals no instance where section 705 has been construed to permit a Court to go beyond the issuance of a stay of the agency action. *See, e.g., Ysasi v. Rivkind,* 856 F.2d 1520 (Fed.Cir.1988) (court found it pointless to petition for a stay under section 705

section 705 concerned exclusively with preliminary relief pending judicial review does not authorize this Court to direct the Government to issue the Loop Canal permit.[29]

### 3. Jurisdictional Conclusions

For the reasons enunciated above, therefore, the Government's motion to dismiss, D.I. 9, herein treated as a motion for summary judgment, is granted in part and denied in part. In particular, the Court dismisses the Plaintiff's requests that this Court enjoin the Government from future enforcement actions and that the Court direct the Government to issue Plaintiff the Loop Canal permit. These remedies are under the present circumstance beyond the scope of relief available to the Plaintiff. As for the pond restoration conditions, the Court finds that it is has the jurisdiction to issue the relief sought by the Plaintiff and therefore does not dismiss the Plaintiff's claim. Consequently, the only issue that this Court must resolve concerns the merits of the Government's after-the-fact permit decision.[30] Specifically, the Court examines whether the Plaintiff has satisfied all the legal prerequisites for the issuance of a preliminary injunction.

### B. *Preliminary Injunction*

The conventional standards for the issuance of a preliminary injunction in this Circuit have recently been described as follows:

> where Plaintiff's property had already been transferred since the action could no longer be "stayed"); . *State of Delaware v. Bender,* 370 F.Supp. 1193, 1205 (D.Del.1974) (court issued preliminary injunction as authorized by section 705 preventing the relevant agency from recognizing the validity of a permit and directing the agency to take any and all steps to prevent the performance of the work authorized by the permit, where the agency decision to issue permit for construction of a bridge found to be arbitrary and capricious).

**29.** Whether the Court has the jurisdiction to grant the Plaintiff its requested relief *after* a complete and final review of the administrative record has been hotly and needlessly contested by the parties and is not ripe for review. The Court's ruling on the "merits" issues is at this stage of the proceedings a preliminary one. Thus, even if the Court finds that the Plaintiff has

A preliminary injunction is an "extraordinary remedy" which will be granted only if the moving party can demonstrate: (1) the reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court should take into account, when they are relevant, (3) the possibility of harm to interested persons from the grant or denial of the injunction, and (4) the public interest (citations omitted).

*Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 634 (3rd Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992).

Additionally, in some instances, this Circuit has seemingly required that the moving party demonstrate a *strong probability* of success on the merits when seeking a stay of an administrative agency action in the form of a preliminary injunction as authorized by section 705. *See A.O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3rd Cir.1976) (did movant make a strong showing that it is likely to prevail on the merits); *Commonwealth of Pennsylvania ex rel. Creamer v. United States Dep't of Agriculture,* 469 F.2d 1387, 1388 n. 1 (3rd Cir.1972) (same); *Penn Central Transp. Co.,* 457 F.2d 381 (3rd Cir.1972) (same); *accord, Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921,

> made a preliminary showing that it is entitled to relief because there is no final decision of this Court, there would be nothing to remand to the Government for reconsideration. Rather, at such a point in time, the case would be set for a full judicial review of the administrative record on an expedited basis. *See Camp v. Pitts,* 411 U.S. 138, 141–43, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (Under the Administrative Procedures Act, judicial review is accomplished by a review of the administrative record).

**30.** The Court finds that as part of its review of the merits determination of the after-the-fact permit process, it is appropriate to consider whether the Government acted appropriately in connecting the Loop Canal permit request to the entire permit application or whether the Plaintiff has made a preliminary showing that the Loop Canal issues should have been treated separately from the section 404 issues.

925 (D.C.Cir.1958) (movant must make a "strong showing that it is likely to prevail on the merits of its case").[31] This potential tension is of no consequence here, however, because the Court finds that the Plaintiff meets both the "heightened" and "conventional" standards for the granting of a preliminary injunction.

1. Probability of Success on the Merits: Pond Restoration and the After–the–Fact Permit

■ Plaintiff raises a number of arguments in order to support its "strong probability of success on the merits" position that the Government was without ample and statutory authority to require the Plaintiff to restore the ponds.[32] First, Plaintiff contends that under the statutory framework of the CWA and the regulations adopted under it,

no permit is required for the excavation or dredging of a pond located in section 404 wetlands. Secondly, Plaintiff contends that the Government impermissibly relied on a Regulatory Guidance Letter (hereinafter "RGL") as the basis for requiring a permit for excavation. Lastly, the Plaintiff contends that the Government has improperly expanded its authority through a misapplication of a procedural regulation. D.I. 3 at 16–30.

■ Plaintiff's arguments are compelling. Presently, the reach of the CWA extends only to the *discharge* of pollutants into navigable waters and not the excavation or dredging activities that occur in section 404 wetlands.[33] Furthermore, the current regulatory standards promulgated under the CWA support Plaintiff's position that pond excavation is not a "discharge of dredged material" subject to CWA jurisdiction.[34]

**31.** Although seemingly encompassing the sort of relief available under section 705, the Court notes that these Third Circuit cases do not squarely treat section 705. Additionally, as indicated by the Plaintiff, D.I. 14 at 22, there exists support outside this Circuit that the standards for section 705 relief are equivalent to the conventional standards for the issuance of a preliminary injunction. *See Corning Savings & Loan Assoc. v. Fed. Home Loan Bank Bd.*, 562 F.Supp. 279, 280–81 (E.D.Ark.1983).

**32.** To succeed on the merits here, Plaintiff must demonstrate to this Court the strong probability that the Government's decision to reject Plaintiff's after-the-fact permit application was in some way:

(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
5 U.S.C. § 706(2)(A–F).

In making this determination, the Court is aware that "[a]gency action is entitled to a presumption of regularity." *Frisby v. U.S. Dept. of Housing & Urban Development*, 755 F.2d 1052, 1055 (3rd Cir.1985). However, "[t]his presumption does not ... prevent [it] from taking a probing, 'hard look' at the agency action." *Id.*,

citing *Overton*, 401 U.S. at 415–16, 91 S.Ct. at 823.

**33.** As noted, *supra*, note 1, any discharge of dredged or fill material into any waters of the United States must be authorized by the Government. Moreover, the Government itself concedes pond excavation in wetlands is not regulated provided that there is no rehandling of materials within waters and wetlands. D.I. 11, Hassel Declaration, at 2, ¶¶ 4–5.

**34.** *See* RGL 85–4 (issued on March 29, 1985) (provided that *de minimis* discharges did not require a permit and that the mere removal of vegetation from the land for excavation purposes did not require a permit). In response to the issuance of interpretive rule RGL 85–4, the USCOE adopted validly promulgated regulations concerning section 404 permit regulations. 33 C.F.R. § 323 *et seq.* Such regulations have the force of law. *Frisby*, 755 F.2d at 1055, citing *Griffin v. Harris*, 571 F.2d 767, 772 (3rd Cir. 1978).

Those regulations provide that the phrase "discharges of dredged material", subject to the jurisdiction of the CWA, *does not* encompass *de minimus* incidental soil movement occurring during *normal dredging operations.*" (Emphasis added). 33 C.F.R. § 323.2(d) ("Permits for Discharges of Dredged or Fill Materials into Waters of the United States—Revised by 51 Fed.Reg. 41220) (November 13, 1986).

Additionally, as provided by the Plaintiff, D.I. 3 at 20–21, the Court finds instructive the stated purpose of this regulation:

Section 404 clearly directs the Corps to regulate the discharge of dredged material, not the dredging itself. Dredging operations cannot

From both the statutory and regulatory framework, the Court easily concludes that absent some affirmative change from the legislature itself[35] or a validly promulgated regulatory revision which observes all the necessary procedures required by law,[36] the Government was apparently without jurisdiction to require the Plaintiff to submit to the after-the-fact permit process for excavation activities and accordingly could not legally compel the Plaintiff to restore the excavated ponds.

The Government does not portend to rely on the express language of the CWA or the regulatory standards cited by the Plaintiff as the source of its authority to require pond restoration in the case at bar. Rather, "[i]n compelling Plaintiff to seek permit approval for the dredging or excavation of ponds in wetlands", D.I. 3 at 25, the Government deviates from the present legal standards indicating that RGL 90–5 provides the basis for requiring a permit for land clearing activities associated with the excavation or dredging that took place in the pond's area. *See* D.I. 4 at 57–58.[37]

> be performed without some fallback. However, if we were to define this fallback as a "discharge of dredged material," we would, in effect, be adding the regulation of dredging to section 404 which we do not believe was the intent of Congress....
>
> 5 Fed.Reg. 41210 (Preamble) (November 13, 1986).

**35.** *See infra,* note 38, discussing House Report 1330, 102nd Congress (June 2, 1992) and Senate Report 1463, 102nd Congress (July 11, 1991).

**36.** The USCOE and EPA are attempting to accomplish this task. *See infra,* at note 38 discussing the "Proposed Rules for the Clean Water Act Regulatory Programs" (as proposed by the USCOE and the EPA on June 16, 1992).

**37.** The Government does not even attempt to counter the Plaintiff's extensive argument, D.I. 3 at 17–30, that the statutory and regulatory history of "dredging" activities reveals that prior to the issuance of RGL 90–5 on July 18, 1990 (first published in 56 Fed.Reg. 2411 on January 22, 1991), pond excavation in section 404 wetlands was not viewed as a jurisdictional activity under the CWA. Rather, the record reflects that the Government simply seeks to alter the current regulatory standards by matter-of-factly adopting 90–5 as a regulation with the force of law. D.I. 4 at 57–58.

RGL 90–5 provides in pertinent part: "... [I]t is our position that mechanized land clearing activities in jurisdictional wetlands result in a redeposition of soil that is subject to regulation under section 404...." *See* D.I. 4 at 245. The Government contends that under this provision it was indeed authorized to require that the Plaintiff apply for an after-the-fact permit for certain pond excavation activities in the first instance and then subsequently require the Plaintiff to restore the ponds when the permit application was denied.

While the Government's decision to adopt the policy put forth by 90–5 is arguably beneficial for the protection of the environment,[38] the Government's profound reliance on it in lieu of its own validly promulgated regulations is fatal to its after-the-fact permit decision here. *Accord, Frisby,* 755 F.2d at 1055 (failure of an agency to act in compliance with its own regulations is fatal to the action) (citation omitted). The Government has essentially adopted the substantive change in current policy called for by this RGL without observing the procedures required by law. *See* 5 U.S.C. § 706(2)(D).

**38.** Whether the construction or dredging of ponds through mechanized land clearing and excavation activities and the subsequent "fallback" that occurs during dredging operations *should* be regulated as a "discharge" under CWA jurisdiction is a significant policy question presently under profound consideration throughout the relevant Governmental agencies and the legislative branch. *See* House Report 1330, 102nd Congress (June 2, 1992) (seeking a new permit requirement for excavation activities); Senate Report 1463, 102nd Congress (July 11, 1991) (same); 57 Fed.Reg. 26894, "Proposed Rules for the Clean Water Act Regulatory Programs" (as proposed by the USCOE and the EPA on June 16, 1992, these agencies seek to eliminate the presumption established by 33 C.F.R. § 323.2(d) that pond excavation activities are not subject to CWA jurisdiction).

That there is comprehensive debate surrounding the issue in the legislature indicates to the Court that the Government clearly does *not* possess the expanded jurisdiction it has asserted here under the "authority" of RGL 90–5. Furthermore, the fact that the USCOE and EPA proposal seeking to create through regulation that which it has done here through reliance on 90–5 is the subject of thousands of comments and, to date, has not been adopted further buttresses the fact that the Government improperly took a "short-cut" in its handling of the case before this Court.

Those procedures require that when a rule is to be used by a governmental agency in a manner having the force of law, to have any effect, it must have been issued in accordance with the appropriate notice-and-comment requirements of section 553 of the APA.[39]

Here, the record plainly demonstrates that the Government relied on RGL 90–5 without satisfying any of the requisite procedures. *See* 5 U.S.C. § 553(b–e) (notice, participation/comment period, advance publication and a right to petition for redress not satisfied); D.I. 3 at 29 n. 63. In fact, the Government does not contend that it met any of these prerequisites. Rather, the Government seemingly claims that 90–5 was merely used for "guidance" as an "interpretive rule" or "general statement of policy" not subject to the notice and comment requirements of the APA. D.I. 10 at 31–33. *See* 5 U.S.C. § 553(b)(3)(A) (exceptions).[40] The Plaintiff

counters that the Government employed RGL 90–5 as a substantive legislative rule requiring the appropriate APA procedures. D.I. 3 at 26–30.

▮▮▮▮▮ The distinction between interpretive and substantive rules is best defined as follows:

> Interpretive rules are those which merely clarify existing law or regulations. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities, . . . . By contrast, substantive rules grant rights, impose obligations, or produce other significant effects on private interests . . . .

*American Ambulance,* 911 F.2d at 907 (citations omitted).[41] When a rule is "substan-

---

**39.** In full, the APA requires the following procedures be followed for rule making:

§ 553. Rule making

(a) This section applies, according to the provisions thereof, except to that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or *personnel or to public property, loans, grants, benefits or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does *not* apply—

(A) to *interpretive rules, general statements of policy,* or rules of agency organization, procedure, or practice (emphasis added); or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through the submission of written data, views or arguments with or without opportunity for

oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretive rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule;

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

**40.** "Federal courts have jurisdiction to determine whether any given rule is interpretive or substantive (citations omitted). That jurisdiction stems from the Administrative Procedure Act's judicial review provision, 5 U.S.C. § 706. Ultimately, it is the court's duty to interpret whether any given agency is complying with the APA." *American Ambulance Service, Inc. v. Sullivan,* 911 F.2d 901, 907 n. 6 (3rd Cir.1990).

**41.** *Accord, Bailey v. Sullivan,* 885 F.2d 52, 62 (3rd Cir.1989) ("If the rule in question merely clarifies or explains other existing law or regulations it will be deemed interpretive") (citations omitted); *Phillips Petroleum Co. v. Dep't of Energy,* 449 F.Supp. 760, 799 (D.Del.) (the "interpretive rules" exception to the notice-and-comment provision of the APA does not apply when the

tive" as compared to "interpretive", it must be issued by the Government agency pursuant to the notice-and-comment procedures of the APA. *Bailey v. Sullivan*, 885 F.2d 52, 62 (3rd Cir.1989); *First State Bank of Hudson County v. United States*, 599 F.2d 558, 564 (3rd Cir.1979), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980); *Rosetti v. Sullivan*, 788 F.Supp. 1380, 1387 (E.D.Pa. 1992) (citing *Bailey* and *First State* ).

■ There is little doubt that in this preliminary instance the Government used RGL 90–5 as a *substantive* rule having the force of law in that it modifies existing law or policy. *See* D.I. 4 at 57–58 ("confirms" that RGL 85–4 has been altered by RGL 90–5 and that based on 90–5, the Government believes that it has the necessary CWA jurisdiction so as to require an after-the-fact permit for extensive land clearing activities undertaken by Salt Pond in connection with the excavation of the ponds). In particular, this RGL alters existing rights by superimposing a permit requirement for activities that under the current statutory and regulatory framework (*see* 33 C.F.R. § 323.2(d)) are not subject to CWA jurisdiction. *Accord, Tabb Lakes, Ltd. v. United States*, 715 F.Supp. 726 (E.D.Va.1988) (court rejected Government's exercise of CWA jurisdiction requiring developer to obtain a permit where Government exercised said jurisdiction via memorandum and not in accordance with the notice-and-procedure requirements of the APA), *aff'd*, 885 F.2d 866 (4th Cir.1989).

Furthermore, because the Government's reliance on this rule imposes extreme additional obligations for Salt Pond and has significant effects on the private interests of the residents in the development (*see* D.I. 4 at 197–2001), the Government cannot rightfully claim that it is an interpretive rule that "merely clarifies existing law." *American Ambulance*, 911 F.2d at 907. Because this interim review of the record indicates that the Plaintiff would eventually succeed in proving that the Government did not comply with the notice-and-comment procedures of the APA, the Court finds that the Plaintiff would undoubtedly prove that the Government was not authorized in the first instance to employ 90–5 as a basis for requiring the Plaintiff to seek an after-the-fact permit for landscaping activities associated with the excavation or dredging of the ponds in wetlands. Furthermore, because no permit requirement can be imposed for such work, the Government cannot compel the Plaintiff to restore the ponds.

■ Perhaps recognizing the patent impropriety of relying on 90–5 as the key ground to support the pond filling requirements of its permit decision, the Government has attempted to minimize its reliance on RGL 90–5, D.I. 10 at 31–33,[42] by emphasizing a new-found theory of regulatory authority whereby the Government can apparently under a procedural regulation take whatever steps it deems necessary to protect the public interest. *Id.* at 27–30. In particular, the Government claims that pursuant to its duties to protect the overall public interest, to protect the particular values of wetlands and to apply the EPA's guidelines, it is empowered to include any and all "special condi-

rule has a substantial impact on the regulated industry and the public in general), *aff'd*, 596 F.2d 1029 (3rd Cir.1978); *Hudson v. Sullivan*, 717 F.Supp. 340, 348 (W.D.Pa.1989) (when a rule modifies existing rights, law or policies, it is a legislative rule requiring notice and comment).

**42.** The Court finds this futile and often confusing attempt to distance itself from RGL 90–5 contradicted by the record which unequivocally establishes the fact that the Government based its initial Cease and Desist letter and subsequent pond restoration requirements on 90–5. In the Cease and Desist letter, the Government specifically indicates that RGL 90–5 alters the existing regulatory framework which provides that the construction of ponds and land clearing activities are *not* subject to CWA jurisdiction as "discharg-

es." D.I. 4 at 57. *See also Id.* at 49–51 (outlining how construction of the ponds and land clearing activities are not subject to CWA jurisdiction under the current regulatory framework).

Specifically, in requiring the Plaintiff to submit to the after-the-fact permit application process the Government concluded that *"[b]ased upon Regulatory Guidance Letter 90–5*, it is the position of this office that all mechanized land clearing activities conducted in jurisdictional waters and wetlands on the subject site are regulated discharges under section 404 (emphasis added)." *Id.* at 58. Moreover, the record clearly indicates that the after-the-fact permit application, as dictated to the Plaintiff by the Government, needed to address the requirements of RGL 90–5. *Id.* at 91–93.

tions" as part of a permit decision for regulated activities over which it does have jurisdiction. *Id.* at 28–29. It indicates that in this instance "[its] authority arises from the fact there were extensive activities at the site which required a permit from the [Government]." *Id.* at 30.[43]

As a source of this "extensive activities/special conditions" authority, the Government points to 33 C.F.R. § 325.4(a), which provides that:

District Engineers will add special conditions to the Department of the Army permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement. *Permit conditions will directly relate to the impacts of the proposal, appropriate to the scope and degree of those impacts and reasonably enforceable.*

*Id.* (emphasis added).

In essence, the Government claims that under this regulation, even though Plaintiff is entitled to engage in the unregulated excavation of ponds, by focusing on certain pond excavation and land clearing activities that it views as jurisdictional, it necessarily acquires CWA jurisdiction over pond excavation itself and, as a result, can require the Plaintiff to restore the ponds.

For numerous reasons, the Court finds the Government's reliance on this regulation to be extremely unpersuasive. First, in issuing its Cease and Desist letter and subsequently requiring the Plaintiff to submit to an after-the-fact permit, the Government incorrectly presumed that it had statutory and regulatory jurisdiction over certain land clearing activities. *See* D.I. 11 at 2; D.I. 10 at 28–30. As has been demonstrated, this presumption of CWA jurisdiction is belied by any reasonable interpretation of the relevant statutes and regulations at issue here or the record presently before this Court.[44]

Second, the Court concurs with the Plaintiff in that such an expansive reading of this regulation is manifestly inconsistent with the jurisdictional limits of the CWA's grant of authority for Government regulation of fill activities (and not excavation activities), as well as 33 C.F.R. § 323.2(d), which provides that excavation of ponds is an unregulated activity. D.I. 3 at 14. To date, no Court has ever given this regulation such an extensive construction.[45]

Lastly, the fact that the legislative and executive branches, as well as countless administrative agencies, are presently debating the issue of whether pond excavation and land clearing activities are to be considered regulated discharges under the CWA repudiates the Government's expansive view of this special conditions provision.[46]

▆▆▆ Accordingly, for all of the above stated reasons, the Court finds that the Plaintiff has demonstrated a strong probability that the exercise of CWA jurisdiction over pond excavation activities and the subsequent pond filling requirements associated with the Government's permit decision was arbitrary and capricious, in excess of the Government's statutory authority under the CWA, was issued without observance of the procedures

---

43. These "extensive" activities as described at note 7, *supra*, were the subject-matter of the after-the-fact permit application as dictated by the Government. D.I. 4 at 91–93. The Government baldly claims that "Plaintiff does not challenge the [Government's] jurisdiction over these activities, some of which were directly related to pond construction." D.I. 10 at 30 n. 13. This contention is clearly refuted by the record. *See* D.I. 4 at 95 ("there are substantial disputes regarding whether the activities described in the within application require a permit"). Rather, the Plaintiff filed for the after-the-fact permit under full reservation of its rights and under a contest of the Government's jurisdiction in order to expedite the matter and facilitate judicial review. *Id.;* D.I. 3 at 10–11; D.I. 14 at 15 n. 43 (citing to the record).

44. In essence, the Government's requirement that the Plaintiff proceed to pond restoration under the guise of special conditions is inappropriate where the Government has likely improperly relied on RGL 90–5.

45. The Court finds the cases cited by the Government dealing with off-site mitigation as a possible permit condition, D.I. 10 at 29–30, to be unpersuasive because they do not deal with prohibiting or "undoing" work resulting from unregulated and non-jurisdictional activities.

46. *See supra,* note 38.

required by law and, in toto, constituted an abuse of discretion. *See* 5 U.S.C. §§ 706(2)(A), (C) and (D).[47] Therefore, as relates to the pond restoration requirements, the Court is satisfied that the Plaintiff has met the probability of success on the merits prong necessary for the issuance of a preliminary injunction.

### 2. Probability of Success on the Merits: Linking the Canal Permit to Section 404 Wetlands Issues

■ In support of its motion for a preliminary injunction Plaintiff also raises the separate and distinct argument that the Government was without authority to mandate that the Loop Canal permit be part of an application for all other permit activities, nor was it authorized to require that issuance of that permit be conditioned upon pond restoration.[48] D.I. 3 at 33–36; D.I. 14 at 16–20. The Government counters that pursuant to its regulations, it was well within its authority to require that the Loop Canal permit request be included with all other activities in one application. D.I. 10 at 33–35.

The Government relies on 33 C.F.R. § 325.1(d)(2). That section provides in pertinent part:

All activities which the applicant plans to undertake which are *reasonably related to the same project and for which a DA permit would be required* should be includ-

ed in the same permit application. District engineers should reject, as incomplete, any permit application which fails to comply with this requirement. For example, a permit application for a marina will include dredging required for access as well as any fill associated with construction of the marina.

*Id.* (emphasis added).

Notwithstanding the impassioned arguments from the Plaintiff, D.I. 3 at 33–36, the Court agrees with the theory espoused by the Government. The plain language of this provision suggests that all activities reasonably related to one project that require a permit should be included in one permit application. Here, the "project" is the housing development and all its concomitant and necessary incidental processes. It is beyond dispute that the request for the Loop Canal permit is "reasonably related" to the project. Indeed, the Plaintiff itself has consistently dramatized how important its issuance is for the viability of the development. Thus, the Government is authorized to require that the request for the Loop Canal permit be included with any other activities requiring a permit "reasonably related" to the housing development.[49]

### 3. Irreparable Injury

■ Having found that the Plaintiff has demonstrated a probability of success re-

---

**47.** Because the Court finds for the reasons stated herein that the Plaintiff has made the necessary showing of "probable success on the merits" based on the totality of these arguments, the Court expresses no opinion on two other arguments raised by Plaintiff: (1) that the Government is somehow estopped from requiring the ponds be restored to wetlands because it was allegedly aware that the Plaintiff was excavating the ponds and indicated to the Plaintiff that a permit would not be required for the excavation of the ponds; and (2) that even if some sort of violation occurred the remedy for such a violation does not properly include the filling in of the ponds. D.I. 3 at 30–33.

**48.** As indicated previously, the Government required that the Loop Canal permit be submitted by the Plaintiff as part of one permit application. That entire permit application was denied. As an alternative to the denial, the Government offered the Plaintiff a permit with "special conditions." Thus, the Plaintiff's argument that it was

improper for the Government to condition the Loop Canal permit on the restoration of the ponds relates solely to the Government's proposed alternative permit.

**49.** Despite this conclusion, the Court finds it necessary to make a practical yet critical observation to the parties. In light of the Court's prior holding that the strong probability exists that the Government was without authority to require the Plaintiff to submit to the after-the-fact permit process as relates to pond excavation and land clearing activities, the only significant activity at issue here over which the Government apparently has CWA regulatory jurisdiction involves the Loop Canal permit. *See* section 10 of the RHA, 33 U.S.C. § 403. Thus, the result may ultimately be that the Government review the Loop Canal permit "separate" from any other issues and that the Government may have to determine whether its issuance is detrimental to the environment or contrary to the public interest.

garding the Government's permit decision, the Court must assess whether Plaintiff has demonstrated that, in the absence of preliminary relief, it will suffer irreparable harm. In support of its plea for injunctive relief the Plaintiff is essentially alleging that if a preliminary injunction is not issued staying the Government's requirement that the Plaintiff initiate pond restoration, it will suffer immediate and catastrophic economic consequences.

Where the moving party is asserting what amounts to be purely economic injury, that party must meet a stringent standard. *Drabbant Enterprises, Inc. v. Great Atlantic & Pacific Tea Company, Inc.*, 688 F.Supp. 1567, 1573 (D.Del.1988). In particular, the moving party must demonstrate a clear showing of immediate irreparable harm and must show that the harm is peculiar, going beyond pure economic injuries which are generally compensable. *Id.*

■ Here, Plaintiff undoubtedly satisfies these standards. The immediate irreparable injury that Salt Pond is subject to if the Court does not stay the pond restoration requirements imposed by the Government extends well beyond the significant cost of actually restoring the ponds. *Cf. A.O. Smith* 530 F.2d at 527 (mere economic burden resulting from government agency's regulation not sufficient to establish irreparable injury). Rather, as a result of the Government's probably improper permit decision, the irreparable injury that will be suffered in the absence

of this stay is the immediate termination of the development project and an *overall loss* of millions of dollars to the Plaintiff. D.I. 4 at 197–201. In particular, the Court is satisfied that unless Salt Pond can indicate to lot owners, home owners, prospective buyers and builders and lending institutions that the ponds need not be filled "there is a strong probability that the development project will fail and the Partnership will lose millions of dollars." *Id.* at 198.[50]

Numerous courts have held that this kind of showing satisfies the "irreparable injury" element of a preliminary injunction application. *See, e.g., Stephen D. Devito, Trucking Inc. v. RISWMC*, 770 F.Supp. 775, 778 (D.R.I.) (irreparable injury shown and preliminary injunction granted where a government action effectively precluded the party from conducting its primary business activity and where the potential economic loss was so great as to threaten the very existence of the moving party's business), *aff'd*, 947 F.2d 1004 (per curium) (1st Cir.1991); *Baltimore and Ohio R. Co. v. Oberly*, 606 F.Supp. 1340, 1347–49 (D.Del.1985) (in reliance on the affidavit of the moving party's general manager, court issued preliminary injunction finding that irreparable injury existed where Plaintiff would likely have to shut down if forced to comply with the State's regulation and was faced with the heavy loss of revenue and their competitive position in a specific market); *Northern Natural Gas v. U.S. Dept. of Energy*, 464 F.Supp. 1145, 1155–58 (D.Del.

---

**50.** The Government argues that Plaintiff's reliance on the affidavit of its Managing Partner, Rupert Smith, to establish irreparable injury is "wholly inadequate" because assertions of dire economic consequences by interested parties are not a sufficient basis for showing irreparable harm. D.I. 10 at 36, citing *Drabbant*, 688 F.Supp. 1567. The Government's position might have more merit if the record before the Court did not reflect that Mr. Smith's affidavit goes beyond mere generalized assertions of potential bankruptcy and loss of customers found insufficient in *Drabbant*.

The record demonstrates that since the after-the-fact permit decision, the Plaintiff's business condition has in fact rapidly deteriorated. *See* D.I. 14 at 32 n. 62, (describing the steep decrease in sales of lots and the loss of lot sales since the after-the-fact permit decision), citing the December 8, 1992 affidavit from Smith (*see* D.I. 15 at 59). There is also tangible evidence in the rec-

ord demonstrating that creditor banks are not secure in the enterprise as a result of the permit decision. D.I. 4 at 200. Additionally, the Court weighs heavily the fact that without the injunction staying the requirement that the Plaintiff restore the ponds, Plaintiff would likely be subject to a multiplicity of lawsuits from residents of the development who purchased their lots with the expectations of receiving waterfront property. *Id.* at 190 (affidavit of lot owner describing that the ponds were the reason that he and his wife purchased the lot).

These factors, combined with the fact that this enterprise represents the Plaintiff's only source of income, convinces the Court that the predictable and natural consequence of the permit decision is that this enterprise will be destroyed if the preliminary injunction does not issue. To that extent, the Court credits the Smith affidavits. *See also Baltimore and Ohio R. Co. v. Oberly*, 606 F.Supp. 1340, 1347–49 (D.Del.1985).

1979) (millions of dollars in overall loss to the Plaintiff held sufficient to constitute irreparable injury, *even though plaintiff's solvency not threatened*).

Furthermore, the Court finds Plaintiff's injuries "peculiar" because, in the absence of this preliminary relief, the Plaintiff is without a viable means of compensation for its business related economic injuries. First, Plaintiff's irreparable injuries are not merely a loss of profits for which they can recover through other business ventures. *Cf. Instant Air Freight Co. v. CF Air Freight Inc.*, 882 F.2d 797, 802 (3rd Cir.1989) (no showing of irreparable injury where moving party was free to secure other business); *Norfolk Southern Corp. v. Oberly*, 594 F.Supp. 514, 520–21 (D.Del.1984) (loss of profits not recoverable immediately but potentially recoverable by the moving party after a hearing on the merits are not "peculiar" and thus do not constitute a showing of irreparable injury by the moving party). Plaintiff is a single enterprise entity, D.I. 4 at 200, ¶ 18, who as indicated faces complete devastation if the pond restoration requirements are not stayed. Moreover, as Plaintiff aptly points out, D.I. 14 at 30, unlike a dispute between private commercial litigants, the Plaintiff has no means of recovering for its economic damages because the Government retains sovereign immunity for its conduct. Thus, Plaintiff has demonstrated that the alleged injuries it will suffer if a preliminary injunction does not issue are "peculiar" in that they are not generally compensable. *Accord, Drabbant*, 688 F.Supp. at 1574. As a result, the Plaintiff has made the requisite showing of irreparable injury in the absence of injunctive relief.

### 4. Harms to Interested Parties and the Public Interest

 In the absence of injunctive relief, the Court also finds that the harm to interested persons such as the lot owners far outweighs any harm to either party if the injunction is issued. In this consideration, the Court weighs heavily the fact that without the injunction staying the requirement that the Plaintiff restore the ponds, Plaintiff would likely be subject to a multiplicity of lawsuits from residents of the development who purchased their lots with the expectation of receiving waterfront property. *See, e.g.,* D.I. 4 at 190 (affidavit of lot owner describing that the aesthetics of waterfront property was the primary reason that he and his wife purchased the lot). Also, in the absence of this injunction, the development will likely collapse, leaving many of the owners without permanent water and utility service. Such a scenario would devastate those who have purchased lots because, without these vital services being offered on a permanent basis, their purchases would effectively be rendered meaningless. On the contrary, the public interest is not harmed by delaying this pond restoration as the ponds have already been excavated and there exists no continuing damage to the environment. Thus, the Court finds that these equitable concerns favor issuing the injunction.

### 5. Preliminary Injunction Conclusions

For the reasons contained herein, the Court finds that the standards for a preliminary injunction have been met in this case. Accordingly, pending a full review of the administrative record prepared in connection with the Government's after-the-fact permit process and decision, the Government action requiring the Plaintiff to completely restore the ponds is postponed. In issuing the preliminary injunction, the Court also declares that (1) the Government was probably without CWA jurisdiction to require an after-the-fact permit for pond excavation activities in the first place and (2) that it was probably without CWA authority to require the restoration of the ponds. Further, the Court cautions that to the extent that the Plaintiff has engaged in activities over which the Government may in fact exercise CWA jurisdiction, the Plaintiff's Loop Canal permit request is properly included as part of one permit application.[51]

---

**51.** Furthermore, the Court notes for the record its concurrence with the Plaintiff's position that under the proposed "alternative" permit, *see supra*, note 48, it is improper for the USCOE to

condition the issuance of the Loop Canal permit on the restoration of the ponds. The "special conditions" regulation upon which the Government relies for the imposition of such extraordi-

## V. SUMMARY

The Government's requirement that the Plaintiff initiate plans to restore the ponds is postponed pending a full review of the administrative record. The Court dismisses the Plaintiff's requests that this Court enjoin the Government from future enforcement actions and that the Court direct the Government to issue Plaintiff the Loop Canal permit on the grounds that they are beyond the scope of relief available to the Plaintiff at this stage of the proceedings.

nary conditions has not been satisfied. In particular, the Court is unconvinced that restoring the ponds is directly related to the impacts of installing utility and sewer service for the development. Moreover, requiring the ponds be restored is certainly beyond the scope of the impacts of the Loop Canal proposal. *See* 33 C.F.R. § 325.4 (special conditions regulation provides that "[p]ermit conditions will be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts and reasonably enforceable"). *Cf., U.S. v. Stoeco Homes, Inc.*, 498 F.2d 597, 607 (3rd Cir.1974) (federal environmental statutes like the CWA do not expand the jurisdiction of the USCOE under the RHA), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975).